OPINION
{¶ 1} Appellant, James K. Warner ("Warner"), appeals the judgment entered by the Portage County Court of Common Pleas. Warner was sentenced to a prison term of 15 years to life for a murder conviction.
 {¶ 2} Warner was a member of the United States Marine Corp. While in the military, he served a tour of duty in Vietnam as a machine gunner. According to Warner, he was involved in significant combat while in Vietnam. In the 1980s, Warner *Page 2 
was diagnosed with post traumatic stress disorder stemming from his service in Vietnam.
 {¶ 3} Warner has not been employed since 1978. He has a 100 percent disability due to his post traumatic stress disorder. He receives Social Security disability benefits. In addition, Warner owns three rental homes in Cleveland.
 {¶ 4} Warner lived in the upper portion of one of the homes he owned for several years. His former girlfriend, Linda Miller, lived in the lower portion of the home. Warner married his wife, Carolyn Warner ("Carolyn"), in March 2003. The two of them lived in Warner's residence in Cleveland for a few months. Then, they moved to a house in Aurora to be closer to Carolyn's work.
 {¶ 5} Warner and Carolyn's marriage was unstable. Warner filed for divorce twice; however, on both occasions, he dismissed the complaints for divorce in the hope of reconciling with Carolyn. Also, there were several domestic disputes that were reported to the Aurora Police Department.
 {¶ 6} On the afternoon of Saturday, November 12, 2005, Warner went to Cleveland to check on his rental properties. While he was in Cleveland, Carolyn went to Cleveland and took his car. Warner called Carolyn and asked her why she took his car, and she accused him of visiting Linda Miller. Carolyn told Warner she was going to pick up her boyfriend and have sex and oral sex with him in Warner's car.
 {¶ 7} Warner obtained a ride home from Cleveland from his daughter. Carolyn was not home when Warner arrived at their house, which was between 6:00 and 6:30 p.m. Carolyn arrived home later that night and awoke Warner, who was sleeping. Carolyn told him they needed to go to Cleveland to get her car, which she left there *Page 3 
when she took Warner's car. Warner did not want to go to Cleveland at that time, but concluded he had "no choice," so he went to the kitchen and made coffee. In the kitchen, Carolyn threw a clock at Warner, which hit him in the leg and broke. She continued to question Warner about his activities in Cleveland.
 {¶ 8} Warner decided to leave the house. Once in his car, he realized that Carolyn had removed his house keys from his keychain. Warner left the residence and went to the Aurora Police Station. There, he met with Officer Bill Byers. After learning of the situation, Officer Byers suggested that Warner spend the night at a local hotel, and Warner agreed to do so. Officer Byers called the residence and spoke with Carolyn. Officer Byers advised Carolyn to leave the house unlocked so he could accompany Warner to allow Warner to retrieve some clothes. Carolyn was not present when Officer Byers and Warner arrived at the residence. Warner got some clothes and went to the hotel, where he spent the night without incident.
 {¶ 9} While Officer Byers was at the Warner residence, Carolyn called. Officer Byers requested that she come to the Aurora Police Station for questioning. Carolyn arrived at the police station around 2:30 or 3:00 a.m. on Sunday, November 13, 2005. Officer Byers interviewed Carolyn at that time. This interview was recorded by video.
 {¶ 10} The following is Warner's version of events after he left the hotel on Sunday morning, November 13, 2005. He arrived home shortly after 11:00 a.m. Carolyn let him into the house. She again questioned Warner about what he was doing in Cleveland the previous day. Also, she informed him about what she had done with her boyfriend the night before. When Warner asked her where his keys were, Carolyn responded they were at a friend's house. *Page 4 
 {¶ 11} Then, while calling Warner names and a liar, Carolyn "grabbed a skillet and clunked [Warner in the head] with it, with a skillet." Warner described the skillet as a small, cast iron skillet, about six to eight inches in size. Carolyn swung the skillet again, striking Warner in the shoulder. After the second hit, the skillet fell to the ground, and Warner obtained it. Warner hit Carolyn with the skillet in the head two or three times. Then, Carolyn retrieved a knife. Warner dropped the skillet and the two fought for control of the knife. Warner gained control of the knife and stabbed Carolyn with it. Carolyn died from her injuries.
 {¶ 12} Upon realizing that Carolyn was dead, Warner decided to commit suicide. He went on a trip to visit Linda Miller; his daughter, Simone Carnail; and his brother, Bobby Warner. He gave a stereo to Linda Miller, and he gave some family pictures to his daughter. Also, he made peace with Bobby Warner regarding an ongoing real estate dispute. Bobby Warner testified that Warner was acting very differently that day, while Linda Miller and Simone Carnail described Warner's behavior as normal.
 {¶ 13} After this trip, Warner returned home. He covered Carolyn's body with some rugs and a towel. At some point, he started both cars in the garage, opened the service door between the house and the garage, and lay on the couch.
 {¶ 14} On the evening of November 13, 2005, Bobby Warner called Warner at approximately 8:00 p.m. Bobby Warner testified that Warner indicated he was laying down just prior to this call. Also, Simone Carnail called and spoke with Warner at about 10:00 p.m.
 {¶ 15} The state's theory of the case is that Warner decided to kill Carolyn when he was at the hotel. The next day, he left the hotel and went directly to visit his *Page 5 
daughter, his brother, and Linda Miller. Then, he returned home and killed Carolyn. Finally, he started the vehicles and lay on the couch.
 {¶ 16} On Monday, November 14, 2005, Bobby Warner was supposed to meet Warner. Bobby Warner called Warner's residence several times, with no answer. Eventually, Bobby Warner and his fiancée, Diane Boyd, went to Warner's residence to check on him. Bobby Warner and Boyd both knocked on the doors and windows of the house, with no response. Eventually, they found an automatic garage door opener in a car parked in the driveway. Upon opening the garage door, they discovered two cars in the garage with their engines running, and noted that the service door to the house was open. They called 9-1-1 and reported the incident.
 {¶ 17} Members of the Aurora Police and Fire Departments responded to Warner's house. Paramedics turned off the vehicles in the garage and began searching the house. They found Warner on a couch in the living room. He was unconscious. In the rescue squad, appellant briefly awoke, in a confused state, and said that Carolyn hit him in the head with a hammer. Warner was removed from the house and transported via helicopter to Metro Health Medical Center in Cleveland. Metro did not have a hyperbaric chamber to treat carbon monoxide poisoning, so Warner was transported to St. Vincent's Hospital, where a hyperbaric chamber was available.
 {¶ 18} Initially, the paramedics and police officers did not find Carolyn's body. However, a few minutes after Warner was found, Captain Ronald Matkowski of the Aurora Fire Department found her body in the kitchen. Carolyn's body was covered in rugs. The paramedics tried to remove Carolyn from the house, but they soon realized she was dead. *Page 6 
 {¶ 19} Warner was indicted on November 22, 2005. He was charged with one count of aggravated murder, in violation of R.C. 2903.01, and one count of murder, in violation of R.C. 2903.02(B). The felony-murder charge alleged that Warner caused the death of Carolyn while committing felonious assault.
 {¶ 20} At his arraignment, Warner pled not guilty to the charges against him.
 {¶ 21} A jury trial was held. Following the state's case-in-chief, Warner moved for acquittal pursuant to Crim.R. 29. The trial court denied Warner's motion for acquittal. Warner renewed his Crim.R. 29 motion at the conclusion of all of the evidence, and the trial court denied his renewed motion for acquittal.
 {¶ 22} Warner sought to introduce two witnesses regarding post traumatic stress disorder. The first witness was Dr. Karpowicz, a licensed clinical psychologist who assessed Warner's case of post traumatic stress disorder. The second witness was Queen Henderson, a nurse counselor, who had counseled Warner about his post traumatic stress disorder for several years. The trial court did not permit these witnesses to testify. Warner proffered their proposed testimony for the record.
 {¶ 23} The trial court instructed the jury on the charged offenses. In addition, the trial court instructed the jury on murder, in violation of R.C. 2903.02, which is the lesser-included offense of aggravated murder. Warner objected to this instruction. The trial court also gave an instruction on self-defense. Warner requested an instruction on voluntary manslaughter. The trial court denied Warner's requested instruction, finding that Warner did not provide sufficient evidence to warrant that instruction.
 {¶ 24} The jury found Warner not guilty of the aggravated murder charge. However, the jury found appellant guilty of a lesser-included offense of aggravated *Page 7 
murder, to wit: murder, in violation of R.C. 2903.02. Although the trial court's judgment entry and the jury's verdict provide that Warner was guilty of murder in violation of R.C. 2903.01, we presume both meant R.C. 2903.02, which was the verbal instruction given to the jury and the correct codification of murder. The jury also found appellant guilty of the felony-murder charge, in violation of R.C. 2903.02(B).
 {¶ 25} The trial court merged the murder convictions for the purpose of sentencing. The trial court sentenced Warner to an indefinite prison term of 15 years to life for his murder conviction.
 {¶ 26} Warner raises eight assignments of error. His first assignment of error is:
 {¶ 27} "The trial court erred when it denied the admission of expert testimony that could have assisted the jury in its determination of whether the appellant possessed the requisite intent to commit murder."
 {¶ 28} "The admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice."[1] "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."[2]
 {¶ 29} Expert testimony is regulated by Evid.R. 702, which provides:
 {¶ 30} "A witness may testify as an expert if all of the following apply: *Page 8 
 {¶ 31} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 32} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 33} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * * ."
 {¶ 34} The Supreme Court of Ohio has held that "[u]nder Evid.R. 702(B), an expert may be qualified by reason of his or her specialized knowledge, skill, experience, training, or education to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue."[3]
 {¶ 35} Voluntary manslaughter is codified in R.C. 2903.03, which provides:
 {¶ 36} "(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 37} Aggravated assault is defined in R.C. 2903.12, which provides, in part:
 {¶ 38} "(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly: *Page 9 
 {¶ 39} "(1) Cause serious physical harm to another or another's unborn."
 {¶ 40} There are two prongs to an analysis of whether the provocation was reasonably sufficient to prompt sudden passion or fit of rage, an objective prong and a subjective prong.[4] The subjective standard concerns "whether the defendant in the particular case `actually was under the influence of sudden passion or in a sudden fit of rage[.]'"[5]
 {¶ 41} Dr. Karpowicz proffered the following testimony regarding people who suffer from post traumatic stress disorder:
 {¶ 42} "Many times they are numb, show very little emotion, show a real detachment. But all of the sudden, under provocation, distress, they can now explode emotionally with anger which people who don't suffer this will not necessarily respond to that extreme."
 {¶ 43} This testimony was relevant regarding the subjective prong of the State v. Shane test. To justify a jury instruction on voluntary manslaughter or aggravated assault, the defense needed to provide sufficient evidence that he was "`actually was under the influence of sudden passion or in a sudden fit of rage.'"[6] Evidence regarding post traumatic stress disorder was critical to this analysis. Dr. Karpowicz's testimony indicated that Warner was more susceptible to an episode of sudden passion or fit of rage than a typical individual. *Page 10 
 {¶ 44} Evidence that the defendant is suffering from post traumatic stress disorder is appropriate in a case where the defendant seeks a voluntary manslaughter instruction. Post traumatic stress disorder is a condition beyond the general understanding of lay persons. The expert testimony may assist the jury in determining if the defendant acted under the influence of sudden passion or acted in a fit of rage. Moreover, the use of expert testimony to show that the defendant is suffering from post traumatic stress disorder is not unprecedented in cases where the defendant seeks a voluntary manslaughter instruction.[7] In State v. Lawrence, the Supreme Court of Ohio held "the jury could have reasonably found that the victims' activities coupled with appellant's mental state [suffering from post traumatic stress disorder] caused appellant to act under the influence of sudden passion or in a sudden fit of rage[.]"[8]
 {¶ 45} Since Dr. Karpowicz's testimony regarding post traumatic stress disorder was relevant to the issue of whether Warner acted under the influence of a sudden passion or fit of rage, and could have assisted the jury in its determination of this issue, the trial court should have permitted his testimony.
 {¶ 46} On appeal, Warner argues that Dr. Karpowicz's testimony regarding post traumatic stress disorder was admissible to explain Warner's lack of recollection of the details of his final encounter with Carolyn. While there is some authority for Warner's position,[9] we will not consider Warner's argument at this time. At trial, Warner only argued that Dr. Karpowicz should be permitted to testify regarding the subjective prong of the State v. Shane test. Warner did not seek to introduce, nor did Dr. Karpowicz's *Page 11 
proffered testimony concern, evidence regarding the effects of post traumatic stress disorder on the ability to recall details about a traumatic event.
 {¶ 47} The trial court abused its discretion by prohibiting Dr. Karpowicz's testimony regarding the effects of post traumatic stress disorder as it relates to whether Warner was acting under the influence of a sudden passion or fit of rage.
 {¶ 48} Warner's first assignment of error has merit to the extent indicated.
 {¶ 49} Warner's second, third, and fourth assignments of error are:
 {¶ 50} "[2.] The trial court erred when it refused to instruct the jury on evidence affecting its determination of whether the appellant possessed the requisite intent to commit murder.
 {¶ 51} "[3.] The trial court erred when it failed to instruct the jury on voluntary manslaughter after appellant established that he was provoked into killing his wife under the influence of sudden passion or fit of rage.
 {¶ 52} "[4.] Appellant was denied due process when the trial court failed to instruct the jury on voluntary manslaughter and aggravated assault after appellant established that he was provoked while under the influence of sudden passion or a fit of rage immediately prior to killing his wife."
 {¶ 53} Due to the similar nature of these assigned errors, they will be addressed in a consolidated analysis.
 {¶ 54} Warner formally objected to the trial court's failure to give a jury instruction on voluntary manslaughter. Warner did not object to the trial court's failure to give an instruction on aggravated assault as an offense of an inferior degree to felonious assault, which was the predicate felony for the charge in Count 2 of the indictment. *Page 12 
Since the law on aggravated assault is nearly identical to that on voluntary manslaughter, Warner has not waived his objection to the trial court's failure to give an instruction on aggravated assault.[10]
 {¶ 55} Aggravated assault is an offense of an inferior degree to felonious assault.[11] This is because the elements of aggravated assault are identical to the elements of felonious assault, except that aggravated assault has an additional mitigating element.[12]
Similarly, voluntary manslaughter is an offense of an inferior degree to murder.[13]
 {¶ 56} "Before giving a jury instruction on voluntary manslaughter in a murder case, the trial judge must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction."[14]
 {¶ 57} The Supreme Court of Ohio has stated that the burden is on the defendant to present "`sufficient evidence of serious provocation.'"[15]
 {¶ 58} "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must *Page 13 
consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at that time."[16]
 {¶ 59} In State v. Shane, the Supreme Court of Ohio outlined a two-part test to analyze whether the provocation was reasonably sufficient to prompt sudden passion or fit of rage. The court observed the first prong of the standard is an objective one, i.e., whether an ordinary person would be brought into a sudden passion or fit of rage when presented with the alleged provocation.[17] Next, the focus shifts to the second prong, which is a subjective standard, i.e., "whether the defendant in the particular case `actually was under the influence of sudden passion or in a sudden fit of rage.'"[18]
 {¶ 60} In the moments before the final confrontation between Carolyn and Warner, Carolyn informed Warner regarding the sexual acts she had engaged in with her boyfriend on the previous evening. In State v.Shane, the victim informed her fiancé that she had been sleeping with other men.[19] The Supreme Court of Ohio held that words informing a spouse of infidelity would "not constitute reasonably sufficient provocation to incite the use of deadly force in most situations."[20]
 {¶ 61} Also, in the moments prior to the final encounter, Carolyn was yelling at Warner, calling him names, questioning him about where he was the previous day, and calling him a liar. In State v. Elmore, the victim was engaged in an argument with the defendant, her ex-boyfriend, when she unexpectedly found him in her home. Following *Page 14 
its holding in State v. Shane, the Supreme Court of Ohio held that the victim's words did not provide sufficient provocation to warrant a voluntary manslaughter instruction.[21]
 {¶ 62} In the case sub judice, Carolyn's words informed Warner of marital infidelity. Further, her words were argumentative, as she was yelling at Warner, calling him names, and asking about his whereabouts on the prior day. Thus, in this matter, the words were more provocative than those uttered in State v. Shane and State v. El mo re.
 {¶ 63} Moreover, unlike the facts of Shane and Elmore, there was evidence presented that Carolyn was the initial aggressor, in that she hit Warner in the head with a cast-iron skillet and attempted to use a knife as a weapon against him. "Assault and battery" and "mutual combat" are "classic voluntary manslaughter situations."[22]
 {¶ 64} In this matter, the objective prong of the State v. Shane test was met. An ordinary person may be incited into a sudden passion or fit of rage, when his wife informs him of her infidelity, calls him names, questions him about his whereabouts, hits him in the head with a cast-iron skillet, and, then, tries to retrieve a knife in an apparent attempt to do more harm to the person.
 {¶ 65} The state argues that portions of Warner's testimony were contradicted by the state's witnesses. For example, the state notes that some witnesses testified that Warner did not have a bump on his head. There may be several reasons why those witnesses did not recall seeing a noticeable bump on Warner's head. However, any inquiry as to what these witnesses testified to regarding a bump transforms the analysis from evaluating the "sufficiency" of the evidence into a weighing of the state's evidence *Page 15 
against that presented by the defense. Again, the relevant inquiry on whether the objective prong has been met is whether the defendant presented "`sufficient evidence of serious provocation.'"[23] The Supreme Court of Ohio has held that "sufficiency is a test of adequacy."[24] Thus, the trial court's job is solely to determine whether the defendant presented enough evidence of serious provocation. The Supreme Court of Ohio has suggested that this be done by accepting the defendant's version of the events as true.[25] Thereafter, the weighing of that evidence is left to the jury, following an appropriate instruction.[26]
 {¶ 66} We will now address whether there was sufficient evidence going to the subjective prong of the State v. Shane test.
 {¶ 67} While Warner did not expressly testify that he acted under the influence of sudden passion or in a fit of rage, there was sufficient evidence regarding this factor. First, Warner testified that after the event, he was still "upset" and "stressed." Also, he testified that his adrenaline was still pumping. This suggests he was extremely worked up during the incident.
 {¶ 68} Second, the bruises and injuries to Carolyn need to be examined. The evidence reveals multiple and severe injuries. This suggests that Warner "went off" during the attack. Such actions are consistent with a person acting under the influence of sudden passion or acting in a sudden fit of rage. *Page 16 
 {¶ 69} Finally, we need to examine Warner's mental state. We have concluded in our analysis of Warner's first assignment of error that the trial court erred by excluding the expert evidence on post traumatic stress disorder. This evidence would have further supported Warner's position that he acted under the influence of sudden passion or in a sudden fit of rage. As a person suffering from post traumatic stress disorder, Warner was more likely to emotionally react to stressful provocation.[27]
 {¶ 70} The totality of the circumstances, including Warner's mental state, Carolyn's initial provocation, Carolyn's resulting injuries, and Warner's testimony that he was upset and stressed, constitute sufficient evidence that Warner was acting under the influence of sudden passion or in a fit of sudden rage when he killed Carolyn.
 {¶ 71} As part of its rationale for denying Warner's requested jury instruction, the trial court noted that Warner's testimony was more consistent with a self-defense theory. At trial, Warner did testify that he was trying to defend himself. However, a defense theory that the defendant acted in self-defense is not mutually exclusive to a theory that the defendant acted under the influence of sudden passion or fit of rage brought on by the victim's provocation. This is especially true in a "mutual combat" situation such as this case. Once attacked, it is reasonable for a person to be acting under the influence of sudden passion or in a fit of rage and, at the same time, be acting to defend himself. *Page 17 
 {¶ 72} Warner provided sufficient evidence of serious provocation brought on by Carolyn and that he acted under the influence of sudden passion or in a fit of rage. As such, the trial court erred by failing to give the jury instructions on voluntary manslaughter and aggravated assault.
 {¶ 73} Warner's second, third, and fourth assignments of error have merit to the extent indicated.
 {¶ 74} Warner's fifth assignment of error is:
 {¶ 75} "The court erred to the substantial prejudice of the appellant when it refused to admit a letter written by decedent which could have contributed to the jury's finding of serious provocation."
 {¶ 76} Warner sought to introduce, through the testimony of an Aurora Police Officer, details of a prior dispute between Warner and Carolyn, where Carolyn allegedly left a threatening note for Warner. The trial court excluded this evidence. Warner offered a brief proffer, which consisted of his attorney explaining what the officer would have testified to. The officer did not testify. Further, no physical note was introduced as part of the proffer. For the purposes of this analysis, we will accept the attorney's account as a proffer. *Page 18 
 {¶ 77} On appeal, Warner asserts the letter was relevant, because it "could have contributed to the jury's finding of serious provocation." Regarding evidence relating to serious provocation, the Supreme Court of Ohio has held that "past instances or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off."[28] The alleged letter was written prior to February 3, 2004, over 21 months prior to the date of Carolyn's death. Since there was sufficient "cooling off" time, this letter was not admissible for the purpose of demonstrating Warner acted under serious provocation in November 2005.
 {¶ 78} The trial court did not abuse its discretion in denying the admission of the purported letter.
 {¶ 79} Warner's fifth assignment of error is without merit.
 {¶ 80} Warner's sixth assignment of error is:
 {¶ 81} "The court erred to the substantial prejudice of the appellant when it permitted the state to introduce inflammatory photographs of the victim's autopsy and to play before the jury a video tape of the victim prior to her death."
 {¶ 82} Initially we will address Warner's argument that the trial court erred regarding the admission of the photographs of Carolyn's body. The state introduced seven pictures of Carolyn's body taken at the crime scene. *Page 19 
 {¶ 83} "Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion.[29 Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused.[30"[31]
 {¶ 84} Evid.R. 403(A) is entitled "Exclusion mandatory" and provides:
 {¶ 85} "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury."
 {¶ 86} Warner did not object to the admission of any of the photographs. Accordingly, he as waived all but plain error relating to their admission.[32] Plain error exists only where the results of the trial would have been different without the error.[33]
 {¶ 87} The state presented seven photographs of the crime scene and 23 photographs of the autopsy. In regard to the majority of the autopsy photographs and all of the crime scene photographs, they have probative value. They show the various injuries to Carolyn's body. In addition, the danger of unfair prejudice with these photographs was minimal, as they all show different angles of different wounds. The trial court did not abuse its discretion in admitting these photographs. *Page 20 
 {¶ 88} Next, we address certain autopsy photographs identified as state's exhibits 58, 59, and 60. These images show a small cut on Carolyn's head. Doctor Dorothy Dean testified that this cut was caused by a blunt impact, such as a baseball bat, rather than being sliced with a sharp object. While pictures of this injury would normally be admissible, the photographs also depict a much larger cut next to the blunt force injury. Dr. Dean testified this cut was made by her staff in preparation to reflect the scalp. These photographs have probative value, in that the jury was able to view the blunt force injury. However, these photographs are prejudicial, because they show injuries to Carolyn's scalp beyond those inflicted by her killer. Upon review, we conclude the probative value of these photographs was substantially outweighed by the danger of unfair prejudice.
 {¶ 89} Also, we need to individually address state's exhibits 61, 62, and 63. These are pictures of Carolyn's head after her scalp had been reflected. The fact that the scalp has been reflected does not, per se, preclude the admission of the photographs.[34] However, we conclude these particular pictures are gruesome.[35] Carolyn's facial features are not visible because her scalp is covering them. These photographs did have minimal probative value, as they corroborated Dr. Dean's testimony regarding the bruising underneath Carolyn's scalp. However, the gruesome nature of these pictures was prejudicial. The probative value of these photographs was substantially outweighed by the danger of unfair prejudice. *Page 21 
 {¶ 90} The trial court abused its discretion by admitting state's exhibits 58-63. However, Warner has not demonstrated plain error in relation to any of the complained of photographs. This is because we cannot conclude the results of the trial would have been different without the admission of these photographs. However, since this matter is being remanded for a new trial, the state should be extremely cautious in attempting to introduce or admit state's exhibits 58-63. The better practice in relation to these photographs, we believe, would be to have the witness explain what was discovered during the autopsy "by way of precise and candid descriptive testimony."[36] This approach will avoid the possible danger of unfair prejudice, while still portraying the details of the autopsy examination to the jury.[37]
 {¶ 91} Next, we address Warner's contention that the trial court erred by admitting a videotape of Carolyn. The videotape shows Officer Byers talking with Carolyn when she went to the Aurora Police Station on November 13, 2005. Warner objected to the playing of the videotape.
 {¶ 92} The videotape was recorded at 2:30 a.m. on November 13, 2005. This was less than 40 hours prior to Carolyn's body being discovered by authorities. In addition, it was less than 12 hours prior to the time Warner testified Carolyn died. Neither side presented any witness, other than Warner, who saw Carolyn alive after the videotape was made. The videotape had probative value, as it, together with Officer Byers' testimony, showed that Carolyn was alive and uninjured in the early morning hours of November 13, 2005. *Page 22 
 {¶ 93} Further, the danger of unfair prejudice regarding this videotape was relatively minimal. The videotape did not contain an audio component, so the jury did not hear Carolyn's voice. Also, only a short portion of the videotape was played for the jury.
 {¶ 94} We cannot say the probative value of the videotape was substantially outweighed by the danger of unfair prejudice. Therefore, the trial court did not abuse its discretion by admitting the videotape.
 {¶ 95} Warner's sixth assignment of error is without merit.
 {¶ 96} Warner's seventh assignment of error is:
 {¶ 97} "The verdicts finding the accused guilty of murder were not sustained by sufficient evidence and are contrary to law."
 {¶ 98} We have found merit in Warner's first, second, third, and fourth assignments of error. Therefore, this matter is being remanded for a new trial. However, Warner's sufficiency argument is not moot. Should we find merit in Warner's sufficiency argument, the state would be barred from retrying him on double jeopardy grounds.[38]
 {¶ 99} The jury found Warner not guilty of aggravated murder. Therefore, we will not conduct a sufficiency analysis in relation to that charge.
 {¶ 100} A trial court shall grant a motion for acquittal when there is insufficient evidence to sustain a conviction.[39] When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier *Page 23 
of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[40]
 {¶ 101} Initially, we will address whether the state presented sufficient evidence to support Warner's conviction for the lesser-included offense of murder, in violation of R.C. 2903.02(A), which provides, in part:
 {¶ 102} "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 103} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender indents to accomplish thereby, it is his specific intention to engage in conduct of that nature."[41]
 {¶ 104} Dr. Dean performed the autopsy on Carolyn's body. Dr. Dean testified that Carolyn died from a stab wound to her torso, which penetrated her left kidney and her aorta blood vessel. She testified that Carolyn had 15 separate blunt force injuries to her body, and six injuries that were cause by a sharp object. Dr. Dean also testified that Carolyn had four wounds to her hands and arms. She described these wounds as defensive wounds, indicating that Carolyn was attempting to defend herself from an attack. In summary, through Dr. Dean's testimony, the state provided sufficient evidence that Carolyn was killed by someone with a sharp object, such as a knife. *Page 24 
 {¶ 105} There were certain stains on the pajama pants and watch Warner was wearing when he was found. Also, there were similar stains on a pair of Warner's shoes. Christopher Smith from the Bureau of Criminal Investigation (B.C.I.) testified that the stains on Warner's pajama pants, watch, and shoes all positively tested as blood. Next, Brenda Gerardi from B.C.I. testified that the blood samples found on Warner's watch, pajama pants, and shoes were consistent with known DNA samples from Carolyn. She testified that the DNA profile found in the known sample from Carolyn and the samples from Warner's watch, shoes, and pajama pants would be expected to be found in one in 107,100,000,000,000,000,000 individuals. Accordingly, the state presented sufficient evidence for a jury to find beyond a reasonable doubt that Carolyn's blood was on Warner's shoes, watch, and pajama pants.
 {¶ 106} Further, the state presented Officer Byers' testimony, regarding the dispute between Carolyn and Warner on November 12, 2005. The fact that Warner and Carolyn were involved in a dispute could provide a possible motive for Warner to kill Carolyn.
 {¶ 107} Finally, the state presented evidence that Carolyn was killed in her own home. Warner was the only other individual present when Carolyn's body was discovered. Two vehicles in the garage were running, suggesting Warner's possible suicide attempt.
 {¶ 108} In light of this evidence, taken together with the other evidence presented by the state, we conclude the state presented sufficient evidence that Warner purposely caused Carolyn's death. *Page 25 
 {¶ 109} Next, we will consider whether the state presented sufficient evidence to support a conviction on Count 2 of the indictment. This count charged Warner with murder in violation of R.C. 2903.02(B), which provides:
 {¶ 110} "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 111} The underlying felony of violence that was charged in this matter was felonious assault, which is codified as R.C. 2903.11 and provides, in part:
 {¶ 112} "(A) No person shall knowingly do either of the following:
 {¶ 113} "(1) Cause serious physical harm to another or to another's unborn;
 {¶ 114} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
 {¶ 115} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."[42] *Page 26 
 {¶ 116} Again, the state presented evidence that Carolyn was killed as a result of a knife wound, Warner was the only other individual present when her body was discovered, and there is an extremely high probability that Carolyn's blood was on Warner's shoes, watch, and pajama pants. Thus, there was sufficient evidence that Warner knowingly caused physical harm to Carolyn and Carolyn's death was proximately caused by Warner's conduct, which constituted felonious assault.
 {¶ 117} Warner's seventh assignment of error is without merit.
 {¶ 118} Warner's eighth assignment of error is:
 {¶ 119} "Both verdicts finding the appellant guilty are against the manifest weight of the evidence and are contrary to law."
 {¶ 120} Due to the trial court's failure to give an instruction on voluntary manslaughter and aggravated assault, along with the trial court's failure to permit Warner's expert to testify, this matter is being remanded for a new trial. Accordingly, Warner's eighth assignment of error is moot.[43] *Page 27 
 {¶ 121} The judgment of the trial court is reversed. The Double Jeopardy Clause contained in the United States and Ohio Constitutions prohibits "a second prosecution for the same offense after acquittal."[44] Since the jury found Warner not guilty on the aggravated murder charge, the Double Jeopardy Clause prohibits Warner from being retried on that charge.[45] Thus, this matter is remanded for a new trial on count 2 and on the lesser-included version of count 1, charging murder in violation of R.C. 2903.02.
COLLEEN MARY OTOOLE, J., concurs,
DIANE V. GRENDELL, J., dissents with Dissenting Opinion.
[1] State v. Nolling, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 43, citingState v. Issa (2001), 93 Ohio St.3d 49, 64.
[2] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[3] State v. Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶113.
[4] State v. Shane (1992), 63 Ohio St.3d 630, 634.
[5] State v. Mack (1998), 82 Ohio St.3d 198, 201, quoting State v.Shane, 63 Ohio St.3d at 634-635.
[6] State v. Mack, 82 Ohio St.3d at 201, quoting State v. Shane,63 Ohio St.3d at 634-635.
[7] State v. Lawrence (1989), 44 Ohio St.3d 24, 26, fn. 3.
[8] Id. at 26.
[9] State v. Gunn (Aug. 7, 1998), 2d Dist. No. 16617, 1998 Ohio App. LEXIS 3593, at *14-15.
[10] See, e.g., State v. Mack, 82 Ohio St.3d at 200.
[11] State v. Deem (1988), 40 Ohio St.3d 205, paragraphs two and four of the syllabus.
[12] Id.
[13] State v. Elmore, 111 Ohio St.3d 515, at ¶ 80, citing State v.Benge (1996), 75 Ohio St.3d 136, 140.
[14] State v. Shane, 63 Ohio St.3d 630, paragraph one of the syllabus.
[15] State v. Mack, 82 Ohio St.3d at 200, quoting State v. Deem,40 Ohio St.3d 205, paragraph four of the syllabus.
[16] State v. Deem, 40 Ohio St.3d 205, paragraph five of the syllabus.
[17] State v. Shane, 63 Ohio St.3d at 634. See, also, State v.Mack, 82 Ohio St.3d at 201.
[18] State v. Mack, 82 Ohio St.3d at 201, quoting State v. Shane,63 Ohio St.3d at 634-635.
[19] State v. Shane, 63 Ohio St.3d at 630.
[20] State v. Shane, 63 Ohio St.3d at 637.
[21] State v. Elmore, 111 Ohio St.3d 515, at ¶ 83.
[22] State v. Shane, 63 Ohio St.3d at 635.
[23] (Emphasis added.) State v. Mack, 82 Ohio St.3d at 200, quotingState v. Deem, 40 Ohio St.3d 205, paragraph four of the syllabus.
[24] State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
[25] State v. Mack, 82 Ohio St.3d at 201.
[26] See, e.g., State v. Shane, 63 Ohio St.3d at 635.
[27] See, e.g., State v. Lawrence, 44 Ohio St.3d at 26.
[28] State v. Mack, 82 Ohio St.3d at 201.
[29] State v. Landrum (1990), 53 Ohio St.3d 107, 121; State v.Maurer (1984), 15 Ohio St.3d 239, 264.
[30] State v. Maurer, supra, paragraph seven of the syllabus;State v. Morales (1987), 32 Ohio St.3d 252, 258.
[31] State v. Nields (2001), 93 Ohio St.3d 6, 25-26.
[32] Id. at 26, citing State v. Williams (1977),51 Ohio St.2d 112.
[33] State v. Issa, 93 Ohio St.3d at 56, citing State v. Moreland
(1990), 50 Ohio St.3d 58, 62.
[34] State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, at ¶95-97.
[35] See, e.g., State v. Tibbetts (2001), 92 Ohio St.3d 146, 156.
[36] State v. Hall, 11th Dist. No. 2002-P-0048, 2003-Ohio-1979, at ¶ 52 (Ford, P.J., concurring.)
[37] Id.
[38] State v. Freeman (2000), 138 Ohio App.3d 408, 424, citingState v. Thompkins, 78 Ohio St.3d at 387.
[39] Crim.R. 29(A).
[40] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307.
[41] R.C. 2901.22(A).
[42] R.C. 2901.22(B).
[43] State v. Freeman, 138 Ohio App.3d at 424. See, also, App.R. 12(A)(1)(c).
[44] State v. Gustafson (1996), 76 Ohio St.3d 425, 432.
[45] Id. See, also, State v. Lovejoy (1997), 79 Ohio St.3d 440, 443, citing Dowling v. United States (1990), 493 U.S. 342, 348.