[Cite as *State v. Hamad*, 2019-Ohio-2664.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | **CASE NO. 2017-T-0108** |
| - vs - | : | |
| NASSER Y. HAMAD, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas.
Case No. 2017 CR 00133.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor; *Christopher Becker*, *Michael A. Burnett*, and *Ashleigh Musick*, Assistant Prosecutors, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Samuel H. Shamansky*, *Donald L. Regensburger*, *Colin E. Peters*, and *Sarah A. Hill*, Samuel H. Shamansky Co., LPA, 523 South Third Street, Columbus, OH 43215 (For Defendant-Appellant).

TIMOTHY P. CANNON, J.

{¶1}  Defendant, Nasser Y. Hamad ("Hamad"), appealed from the entry on sentence issued by the Trumbull County Court of Common Pleas on November 20, 2017, in case No. 2017 CR 00133.  A jury found Hamad guilty of two counts of Aggravated Murder, with firearm and aggravated circumstances specifications, and six counts of Attempted Aggravated Murder, with firearm specifications.  The jury did not make the requisite findings for imposition of the death penalty as had been requested by appellee,

the state of Ohio. The issues on appeal relate to a request for a jury instruction, the exclusion of expert testimony, the conduct of the prosecutor, and the jury's verdict. The judgment is affirmed.

## Statement of the Case

**{¶2}** This case stems from a physical altercation and shooting that took place outside Hamad's residence in Howland Township, Ohio. Prior to the altercation, 47-year old Hamad had engaged in an exchange of offensive communications via social media and text message with 19-year-old Bryce Hendrickson ("Bryce") and 17-year-old John Shively ("Shively"). The three traded insults and threats of physical violence; Hamad was also the subject of death threats and racial insults. The precipitating cause of the hostility was Hamad's relationship with Bryce's mother, Tracy Hendrickson ("Tracy"), and Hamad's ongoing verbal feud with Bryce's father, Brian Hendrickson ("Brian"). Tracy and Brian were separated; Tracy and Hamad were living together.

**{¶3}** On Saturday, February 25, 2017, at approximately 4:30 p.m., four young men arrived at Hamad's residence: 19-year-old Bryce; 17-year-old Shively; 19-year-old Joshua Haber ("Haber"); and 20-year-old Josh Williams ("Williams"). They were driven there by 43-year-old April Trent, a.k.a. April Vokes ("April"), Shively and Haber's mother. Hamad's residence was located on a busy state route near a shopping mall, which resulted in numerous eye witnesses who later testified at trial.

**{¶4}** A confrontation ensued, and a physical fight broke out in the front yard. Hamad ended up on the ground, where he was kicked and struck numerous times. When the young men returned to the van, Hamad went inside his house. Hamad came back outside with a 9mm handgun and fired at the van, which was at the end of his driveway attempting to back out. Hamad again went inside and reloaded his handgun. After the

2

first round of fire, April and Williams were injured and unresponsive inside the van. Bryce and Shively were also injured, but they exited the van and attempted to flee on foot. Haber exited and remained near the van. Hamad came back outside and fired the handgun several more times. As Haber attempted to jump back into the van, Hamad shot him.

{¶5}   April was shot a total of six times, Bryce twice, and Shively once.

{¶6}   Haber was shot twice and died at the scene.

{¶7}   Williams was shot at least four times and later died at the hospital.

{¶8}   On March 1, 2017, the Trumbull County Grand Jury indicted Hamad on two counts of Aggravated Murder (Count 1 and Count 2), in violation of R.C. 2903.01(A), each with an aggravating circumstances specification pursuant to R.C. 2929.04(A)(5); and six counts of Attempted Aggravated Murder (Counts 3, 4, 5, 6, 7, 8), in violation of R.C. 2923.02(A)&(E)(1) and R.C. 2903.01(A). Each of the eight counts carried a firearm specification pursuant to R.C. 2941.145. Hamad pled not guilty and was held without bond.

{¶9}   The state filed two motions in limine. The first sought to prohibit Hamad from requesting, and the court from instructing the jury on, the affirmative defense of self-defense. The state asserted that Hamad "by his own words and actions fails to meet any of the three prongs of self-defense and as a matter of law this Court cannot give such an instruction." The second motion sought to prohibit Hamad from introducing expert testimony regarding his claim of self-defense. Defense counsel responded with a memorandum on the use of an expert in establishing self-defense. The defense proffered that its expert, Dr. James Reardon, would testify that Hamad was suffering from Post-Traumatic Stress Disorder as a result of death threats he received over a period of six

3

months and the beating he suffered on February 25. The trial court denied both motions in limine, finding the issue of self-defense was premature; the motions would be addressed, if necessary, at the appropriate time during the trial.

{¶10} At the conclusion of the state's case-in-chief, defense counsel filed a supplement to their motion to present the expert testimony of Dr. Reardon. The trial court ruled that Hamad was not permitted to introduce the testimony during the initial phase of the trial, but it later permitted the expert's testimony during the mitigation phase.

{¶11} After the defense rested, defense counsel requested jury instructions on Murder and Voluntary Manslaughter. The trial court instructed the jury on Murder and Attempted Murder, but it denied the motion as to Voluntary Manslaughter. Over the state's objection, the trial court also instructed the jury on the affirmative defense of self-defense.

{¶12} On October 30, 2017, the jury returned a verdict of guilty on each count of Aggravated Murder and Attempted Aggravated Murder, including both aggravating circumstances specifications and each firearm specification.

{¶13} After hearing evidence in mitigation of the death penalty, the jury returned its verdict of sentence on November 8, 2017. The jury did not make the requisite findings for imposition of the death penalty. Rather, the jury found Hamad should serve life imprisonment with parole eligibility after 30 full years of imprisonment for each Aggravated Murder conviction. The state filed a sentencing memorandum, requesting the trial court sentence Hamad to consecutive sentences for each offense and firearm specification.

{¶14} A sentencing hearing was held November 9, 2017. Over the state's objection, the trial court merged Counts 3 and 4, Counts 5 and 6, and Counts 7 and 8.

The state elected to proceed with sentencing on Counts 3, 5, and 7. The trial court sentenced Hamad as follows:

> Count 1: life imprisonment with parole eligibility after 30 years, plus 3 years mandatory on the firearm specification, to be served prior to and consecutive to the life sentence;
>
> Count 2: life imprisonment with parole eligibility after 30 years, plus 3 years mandatory on the firearm specification, to be served prior to and consecutive to the life sentence;
>
> Count 3: 11 years in prison, plus 3 years on the firearm specification;
>
> Count 5: 11 years in prison, plus 3 years on the firearm specification;
>
> Count 7: 11 years in prison, plus 3 years on the firearm specification.

Counts 2, 3, 5, and 7 were run concurrently with Count 1, resulting in an aggregate term of life imprisonment with parole eligibility after 30 years, plus 3 years for each of the firearm specifications in Counts 1 and 2, to be served prior to and consecutive to the life sentence. The trial court entered its sentence on the docket on November 20, 2017.

{¶15} Hamad noticed an appeal on November 22, 2017.

{¶16} Hamad passed away in prison on September 9, 2018, while his appeal was pending. On October 10, 2018, the state filed a "Suggestion of Death and Motion to Substitute Party." The state moved to substitute Hamad's attorney, Samuel H. Shamansky (hereinafter "appellant"), as party representative on appeal. This court granted the motion, pursuant to App.R. 29(A). *See also State v. McGettrick*, 31 Ohio St.3d 138 (1987). We therefore proceed to the merits.

{¶17} Appellant raises four assignments of error for our review:

> [1.] The trial court erred by failing to instruct the jury on the inferior offense of Voluntary Manslaughter, in violation of [Hamad's] rights as guaranteed by the Sixth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution.

[2.] The trial court erred by prohibiting [Hamad] from introducing expert testimony regarding PTSD and a concussion suffered by [Hamad], as it related to self-defense, voluntary manslaughter, and prior calculation and design, in violation of the Ohio Rules of Evidence and [Hamad's] rights under the United States and Ohio Constitutions.

[3.] [Hamad's] convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Ohio Constitution.

[4.] The trial court failed to order a mistrial or give an appropriate curative instruction after the prosecutor engaged in gross misconduct that resulted in unfair trial to [Hamad], in violation of his rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**Evidence Adduced at Trial**

{¶18} The jury trial began on October 19, 2017, with a jury view of April's van and Hamad's residence in Howland Township, where the shooting occurred. The jury also viewed Hamad's residence from sites nearby, where various fact witnesses were located during the altercation. Many of these eyewitnesses testified during the trial.

{¶19} Bryce died prior to trial from causes unrelated to the shooting. Testimony regarding the events that led up to the shooting, as well the events of February 25, was provided by Shively, April, and Tracy. Tracy was called as a court's witness. Hamad also took the stand in his own defense.

{¶20} In the fall of 2016, Tracy left her husband, Brian, and moved out of the home they shared with their two sons, 19-year-old Bryce and 18-year-old Dylan. She testified that Brian and her sons were abusing drugs, and Brian had become abusive towards her. Tracy initially moved into an apartment with her adult daughter. Tracy began dating Hamad. Brian, Bryce, and Dylan ("the Hendricksons") began harassing the couple. Because she felt unsafe, Tracy eventually moved in with Hamad. Hamad owned a

6

construction business, which was situated on the lot with his house. At the time, the Hendricksons lived around the corner from Hamad; prior to the shooting incident, however, they had moved to an address in Warren.

{¶21} Tracy testified that the harassment began with text messages to her phone. After Tracy disconnected her phone, Bryce began harassing Hamad on his Facebook page, including obscene and racial insults. Tracy was also aware of threatening text messages Bryce sent to Hamad with pictures of Bryce and Williams holding firearms and knives. Some of these were shown to the jury.

{¶22} According to Tracy and Hamad, the Hendricksons frequently drove past Hamad's residence, at all hours, and sometimes entered his driveway at night. They threw trash in the yard and shouted obscenities out the window. Hamad testified that Brian came to his property a couple of times to confront him. Hamad also claimed he heard shotgun shots that he assumed came from the Hendricksons' property after they would see Tracy at Hamad's. Hamad testified he received death threats. He was afraid and paranoid and was not getting much sleep.

{¶23} An incident occurred at Hamad's residence on November 6, 2016, which prompted multiple calls to the police. Tracy's daughter was visiting, and her tires were slashed while they were inside Hamad's house. Accusatory phone calls went back and forth between those at Hamad's house and those at the Hendricksons'. Police reports were generated by Hamad, Brian, and Tracy's daughter. The police advised them each to contact the prosecutor's office, but no one pursued charges. Hamad testified that the police refused to do anything. This was the only day Hamad contacted the police about the incidents between the families.

{¶24} On January 28, 2017, Bryce, using an alias, posted to a Facebook group looking for Xanax: "Where the xans." Concerned for her son, Tracy returned home to the Hendricksons for a few days in early February 2017. Tracy was still dating Hamad, however, and soon returned to Hamad's home after she determined she could not help Bryce.

{¶25} Tracy mailed a birthday card to Bryce. When she and Hamad returned home in the early morning hours of February 25, 2017, Tracy found the card on Hamad's door with the handwritten statement, "We hope you die," among others, in Brian's and Bryce's handwriting. The card was later discovered in Hamad's home by investigators.

{¶26} Tracy and Hamad were together at Hamad's residence on February 25, 2017. That day, Hamad commented on Bryce's January 28 Facebook post, indicating the local court would be interested in his search for Xanax: "Cortland central district likes this." This comment prompted an intense and aggressive verbal exchange between Hamad and Bryce, which included threats, invitations to fight, vulgarity, and racial insults. Several other minors also participated in the Facebook exchange, including Bryce's cousin, 17-year-old Shively.

{¶27} Shively and Bryce had never met each other in person. Shively had just moved from Florida to Ohio 12 days prior with his mother, April, and his siblings. Shively's father (April's ex-husband) and Bryce's father (Tracy's estranged husband, Brian) are cousins. April testified that she and Brian had talked about dating when she moved back from Florida. Tracy testified that April had sent her a picture of them together.

{¶28} Shively testified as to the Facebook exchange between Hamad and Bryce. It went on for a few hours, back and forth. The following are excerpts. Hamad wrote to Bryce: "I home bring your gang I don't need guns for u pussys"; "Bitch dont just talk come";

8

"I waiting.. No more texting pussy." Bryce responded: "If you guys wanna stop isis start here"; "He's a terrorist"; "We were on your property 3 times you're a fucking pussy you don't want to fight."

{¶29} Shively chimed in on the post and repeatedly asked Hamad for his address. Bryce told Shively to pick him up and he would take him to the address: "Scoop I'll show you I ain't got a ride or I'd go cave this numb skulls lumpy head in." Hamad then responded with his address and continued taunting them to come over: "Action motherfukers where is it." Bryce also wrote to Hamad: "I ain't scared of you. I ain't scared of jail. I ain't scared of shit. You dead boi"; "Imma beat the fuck out of you." Shively then indicated he would pick up Bryce and wrote, "Nasser Hamad I'm comin."

{¶30} When questioned as to his purpose in asking for Hamad's address, Shively repeatedly testified it was so they could "just take care of the problem" or "resolve the problem," "however it would have happened." On cross-examination, Shively did not recall saying to investigators, "I'm not going to say we went there to whip his ass, but like, we went there to take care of it." He did admit, however, to sending a text message stating they were going to "whop this old n***er's ass" but testified that he "didn't mean it in any racial form."

{¶31} April was made aware of the Facebook exchange and became upset that an adult was speaking in that manner to Shively, her teenage son. April did not know Hamad but decided to confront him at his home. Shively and his half-brother, 19-year-old Haber, rode with April. April testified she reluctantly agreed to pick up Bryce on the condition that he remained in the van. Another cousin, 20-year-old Williams, was near Bryce's home, and he also got in the van.

9

**{¶32}** April testified she wanted to defuse the situation, but she had never thought about a fight occurring. She did not recall telling the detectives that she thought a fight was going to happen.

**{¶33}** Bryce provided April with directions to Hamad's house on State Route 46 in Howland Township. April was driving, Shively was in the front passenger seat, and the other three were in the middle bench seat. Shively denied ever having or seeing a weapon in the van but admitted Bryce told the group he had brought a knife. April testified she told Bryce to keep the knife in the van, and he threw it on the floor in between the front seats; it was in a sheath.

**{¶34}** The van entered Hamad's driveway at approximately 4:30 p.m.

**{¶35}** Hamad testified he went outside and waved because he did not recognize the vehicle. He stated cars often pull into his driveway either to turn around or to ask about the construction business. Hamad did not know or recognize April or Shively. He also testified that he thought Shively had been commenting on the Facebook post from Florida, which is where Tracy told him the family lived.

**{¶36}** April and Shively both testified that Hamad exited his house and approached the van aggressively. April exited the van and confronted Hamad, screaming about him threatening a group of teenagers and trying to fight a minor, referring to Shively. Shively exited the van, either immediately before or immediately after April, and moved either behind Hamad or to Hamad's side.

**{¶37}** Hamad testified that Shively was smirking, had his hands hidden in his sweatshirt pocket or under his shirt, and "was up to something, you could tell." Hamad grabbed Shively and threw him to the ground. Bryce, Haber, and Williams then exited

the van.  Shively testified they all "jumped in, and got in."  Tracy exited the house and began yelling.

{¶38}  Hamad claimed he felt something hard and metallic hit his back, then his head, then his spine.  He ended up on the ground.  Hamad testified he tried to block the punches and kicks: "I wanted to defend myself somehow.  You can't just stay down there.  If you do, I would have been dead.  My skull would have been crushed.  My spine would have been broke."

{¶39}  Witnesses driving along the busy state route observed the altercation and called 911.  They saw a group of young people beating up someone who was down on the ground, approximately 10-15 feet in front of a house.  The victim of this assault was being kicked and hit.  One witness also noticed a woman, who was pointing and screaming.

{¶40}  Shively admitted Hamad was kicked while he was on the ground, but he had no memory as to who was doing the kicking.  He said the "scuffle" lasted about 13-15 seconds and admitted that the kicking and stomping could have been fatal to Hamad.  Shively, realizing the situation had escalated too far, tried to separate the group from Hamad, and Hamad returned to his feet.  Shively remembered April screaming and that she "kind of stepped in."  April testified, however, that she did not see the fight because it was over within seconds, and she and Tracy were arguing.  The group quickly got back in the van, and April began to back down Hamad's driveway towards the road.  Hamad turned and walked toward the house.  Tracy and Hamad both testified that they did not initially recognize her son, Bryce, as one of the people in the group.

{¶41}  Hamad testified that he heard someone yelling, "Get the gun. Grab the gun."  Hamad entered his house, and Tracy locked the door behind him.  Hamad retrieved a

11

loaded 9mm handgun from his bedroom, because he feared the group was going to "swiss cheese" his house with a firearm. Hamad paused and then heard someone yell, "we not done with you, bitch. Come on out, sand n***er." He told Tracy to get behind the chimney. He cocked the gun and noticed his hand was injured; then he unlocked the front door and exited the house.

{¶42} Hamad testified that he had the firearm at his side because he wanted to hold the group for the police: "you know, this has got to stop. It doesn't matter. They came to my house in broad daylight. And it's happened before. Nobody does anything." By this time, Hamad had an idea of who the people in the van were, but he still did not recognize Bryce as one of them. Hamad stated he instructed the group to stop moving, but the front-seat passenger went down out of sight and the back-seat passengers were all moving. Hamad testified he fired two shots, "low," to "hit him in the leg, you know. Send a message." "I never aimed the whole time," Hamad testified. "I just used the line of my body when I did it."

{¶43} Several eyewitnesses testified that the van was attempting to back out of the driveway onto State Route 46 when they first heard gunshots. The van missed the road and ended up partially in the yard. No one was seen outside of the van at that point, except for Hamad. One witness testified Hamad was "barely out of the front door" when he fired the first shots. Another testified Hamad lifted the weapon and fired as soon as he came out of the house and went down a couple steps. Other witnesses did not notice Hamad until he was closer to the van.

{¶44} April testified that the boys were yelling for her to "go, go, go" when she was struck in the head by a bullet and blacked out. The vehicle came to rest across the top of Hamad's driveway near the road, at a diagonal.

12

**{¶45}** Shively saw Hamad exit the house with a firearm. He testified that Hamad took a couple steps and then started shooting at the van. Hamad left his porch and approached the van. Shively was in the front passenger seat; he ducked down on the floor in front of the glove box. Shively then heard and felt the passenger window break, and his back went numb from a bullet striking him. When Shively looked up, Hamad was approximately six to seven feet from the van.

**{¶46}** Hamad testified he told the occupants not to move. Hamad continued firing because he believed the occupants kept reaching for something and were still a threat to him. He said the side passenger sliding door was open, and he thought they were going for a gun. He again heard someone yell, "grab the gun" or "get the gun." At trial, Hamad was "still convinced right now they had a gun or guns on them. It wasn't just a knife."

**{¶47}** Hamad testified he walked up to the front passenger side door and told them not to move. Then, Hamad said, one of the young men in the back seat, who he later learned was Bryce, lunged at him with a knife. Hamad then fired several more shots at the occupants.

**{¶48}** Shively testified that Williams, sitting behind the driver's seat, had been shot in his rib area. April had also been shot and was unable to drive. Bryce and Shively were also hit.

**{¶49}** Hamad then realized he was out of bullets, turned around, walked to the house, and went inside. He knew that April and two of the passengers had been shot: "Still two in my mind that weren't hit."

**{¶50}** A few of the young men exited the van. Williams remained inside the van with a bullet wound to his chest. Haber stayed near the van. Bryce, who had been shot in the face, and Shively, who had been shot in the back, attempted to flag down cars for

help. A certified EMT and firefighter, off duty at the time, pulled over to render aid to what he assumed was a car accident or medical emergency. He saw April slumped over in the driver's seat.

{¶51} Hamad had reloaded and exited the house. The EMT, as he was reaching for his medical supplies, yelled out, "What's going on?" He heard someone respond, "I'll show you," and then noticed Hamad standing next to the passenger side of the van, "fumbling" with a firearm. Hamad testified that he had told the EMT he was not going to shoot him. The EMT then observed bullet holes in the van's windshield. The EMT got back inside his car and saw Hamad "lift his arm into the passenger side of the car and fire three shots" at April. Others testified that Hamad was holding the gun either immediately next to or actually within the van at the front passenger side window. April testified she felt the gun against her knee.

{¶52} According to Hamad, he fired a few more times because the people inside the van kept reaching for something. He did not stay inside his house, he said, because "they were a big threat, just as worse or maybe worse than before"; "they had more time to grab the gun—or they have it now."

{¶53} The EMT drove to the back of the property; not finding an exit, he fled on foot. As he looked back, he saw Hamad arguing with Haber outside the van. Haber was screaming, "You shot my mom. You killed her. You bastard." Haber then attempted to jump into the van, when Hamad fired two more shots. The EMT last saw Haber lying face down with his legs sticking out the passenger side of the van.

{¶54} Bryce and Shively again fled on foot. Bryce ran across State Route 46; Shively ran down the side of the road. Eyewitnesses testified it appeared that Hamad

14

was shooting at them as they fled.  Hamad admitted he took a shot at Shively as he was running away.

{¶55}  A forensic artist for BCI was running errands in her personal vehicle on State Route 46 when Bryce ran across in front of her.  Her dashboard camera recorded portions of the altercation.  She testified at trial, and the video recording was used during the testimony of various other eyewitnesses.

{¶56}  A trauma nurse and her 15-year-old son were also driving on State Route 46 when they noticed what they thought was a car accident.  They turned around to assist, and the nurse began rendering aid to April, who was in shock and in and out of consciousness.  Williams and Haber were in the back seat, not moving or responding.  The nurse then noticed Hamad pacing with his handgun in the driveway.  She testified that she and her son got back into their car and attempted to back out of the driveway.  She stated that Hamad aimed the gun at them and started walking towards them.  Hamad denied this.  Before they could leave, law enforcement arrived.

{¶57}  Shively turned around and ran back towards the van.  He fell to his knees in the neighbor's yard, crying, "He shot my mom."  He made it back to the van, where he saw his mother April bleeding and unconscious, and his brother Haber lying on the floorboard behind the front seats.  He also saw Williams in the back seat.  Shively thought both Haber and Williams were dead.  He then noticed Bryce, outside the van, who had a hole in his nose and was bleeding from his mouth.

{¶58}  As the police cars arrived at the scene, Hamad turned around and walked toward the house.

{¶59}  Officer Mark Klaholz and Officer Brian Butto, with the Howland Police Department, were the first to arrive on scene.  They found April's van parked parallel to

15

State Route 46 in front of Hamad's residence and observed traffic had stopped in both lanes. The nurse resumed aid to April in the driver's seat, while her son spoke to Shively. The officers observed Haber and Williams in the back of the van. Williams was slumped over on top of Haber, moving around in obvious pain. Haber appeared to be lifeless.

{¶60} Officer Klaholz observed Hamad walking up to the steps of his house holding a handgun at his side. He ordered Hamad to drop the gun, but Hamad continued into the house. Tracy was holding the screen door open for him. Officer Klaholz took cover and commanded Hamad to come out with his hands up. He heard Tracy shout, "he's put the gun down," and then Hamad exited with his hands up. Hamad laid down on the front steps and was arrested without further incident. Tracy was removed from the house. A knife was seized from Hamad's person, and the 9mm handgun was found on the floor just inside the front door. Hamad told the officers he was not injured but feared retaliation from the victims' family members.

{¶61} Officer Butto testified that Bryce identified Hamad as the one who had shot them all. As he walked Hamad to the patrol car, Hamad tried to pull away towards Bryce. Hamad yelled to Bryce, "That's what you get, you little bitch. How do you like that?" Other witnesses testified that they heard Hamad shout, "This is what you deserve. I'm not done with you, you little bitch"; or "How do you like that, you little bitch." Hamad denied making these statements but did admit that he said something to Bryce.

{¶62} Tracy testified that she did not see the actual shooting because she was inside, hiding behind the fireplace. Numerous witnesses testified that the only weapon they saw was Hamad's handgun and that Hamad appeared angry and agitated. Hamad testified the only weapon he ever saw was the knife Bryce used to threatened him, which

16

he did not see until he was at the van already shooting. There were no other firearms located in the area, in the van, or on any of the victims.

{¶63} In total, Hamad fired his 9mm handgun at the five victims a minimum of 18 times. April was shot six times, in her head, chest, hand, arm, and leg. Shively was shot once in his back. Bryce was shot twice, including once in his face. Officer Butto testified Bryce could barely speak because his mouth was filled with blood from a gunshot wound.

{¶64} Haber and Williams both lost their lives as a result of their gunshot wounds. Haber was shot twice: one bullet lacerated the top of his head; the other penetrated his abdomen, perforated his diaphragm and pierced the aorta, then lodged in his neck. Haber died at the scene. Williams was shot at least four times, in the chest and rib cage area, and later died at the hospital.

{¶65} Following Hamad's arrest, the crime scene was secured by the Trumbull County Prosecutor's Homicide Task Force. Investigators collected bullet fragments, 16 spent casings, live ammunition, two magazines, Hamad's semiautomatic 9mm handgun, Hamad's knife, another knife with Bryce's DNA found in the yard, blood samples, April's van, and a knife sheath found on the front passenger side floor of the van. The forensic testimony demonstrated that the bullets came from Hamad's handgun and were fired into the van from the outside. One bullet was found along State Route 46. All of the spent shell casings also matched Hamad's firearm. Blood stains on Hamad's firearm and Hamad's sweatshirt contained DNA consistent with both Hamad and April. It was also determined that the distance from Hamad's front door to the front passenger corner of the van where it came to rest was 73.11 feet.

{¶66} Interviews of Hamad and other witnesses were conducted by Detective Anthony Villanueva and Detective Michael Yanucci. Hamad told them that he was acting

17

in self-defense and that he hoped the victims were all dead. Hamad stated he did not see Bryce until he was walked to the police car in handcuffs: "If I knew he was there, he would have been my target." Hamad had visible injuries to his face and head, and he was later treated for a navicular fracture of his left hand.

## Jury Instructions

{¶67} In the first assignment of error, appellant challenges the trial court's decision not to instruct the jury on the inferior offense of Voluntary Manslaughter. He asserts the facts adduced at trial could have reasonably supported Hamad's acquittal as to Aggravated Murder but conviction as to Voluntary Manslaughter.

{¶68} Upon defense counsel's oral request for the jury instruction, the parties disagreed as to whether instructions on self-defense and voluntary manslaughter were mutually exclusive. The trial court orally denied the request, stating:

> The Court has reviewed the case law cited by counsel, and I think there probably is at certain times a fine line between the two. But they could be – the facts could warrant the presentation of the charge of aggravated murder, the lesser included murder and an additional charge. But in this case, based on what the Court heard set forth by the defense, I don't think it's warranted. So we will not give that charge at this time.

The trial court therefore instructed the jury on Murder, but not on Voluntary Manslaughter.

{¶69} Pursuant to R.C. 2945.74, "the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." *See also* Crim.R. 31.

{¶70} Hamad was charged with Aggravated Murder in violation of R.C. 2903.01(A), which provides: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." "Voluntary manslaughter is considered an inferior degree offense to aggravated murder, which means that 'its elements are identical

18

to or contained within the indicted offense, except for one or more additional mitigating elements.'" *State v. Benge*, 75 Ohio St.3d 136, 140 (1996), quoting *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph two of the syllabus.

**{¶71}** Voluntary Manslaughter, defined in R.C. 2903.03(A), permits a defendant to mitigate a charge of Aggravated Murder if the defendant establishes the mitigating circumstances of (1) sudden passion or (2) a sudden fit of rage, either of which must have been brought on by serious provocation by the victim that was reasonably sufficient to incite the defendant into using deadly force. *Id.*, citing *State v. Rhodes*, 63 Ohio St.3d 613 (1992), syllabus.

**{¶72}** Thus, a defendant charged with Aggravated Murder is entitled to an instruction on Voluntary Manslaughter only when sufficient evidence is presented at trial that would allow the jury to reasonably reject the charged offense of Aggravated Murder and find the defendant guilty of Voluntary Manslaughter. *State v. Perry*, 11th Dist. Trumbull No. 94-T-5165, 1997 WL 590789, *4, citing *Deem*, *supra*, at 211; *State v. Shane*, 63 Ohio St.3d 630, 632-633 (1992); and *State v. Thomas*, 40 Ohio St.3d 213, 216 (1988). "The key issue that must be addressed by the trial judge is whether, upon construing the evidence 'in a light most favorable to the defendant, a reasonable jury could find that the defendant had established by a preponderance of the evidence the existence of one or both of the mitigating circumstances.'" *Id.* at *5, quoting *Rhodes*, *supra*, at 617-618; *see also State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶37.

**{¶73}** "Initially, a court is to utilize an objective standard to determine whether the provocation is reasonably sufficient as a matter of law to trigger a sudden passion or a sudden fit of rage." *Id.*, citing *Shane*, *supra*, at 634. "The provocation must be *reasonably sufficient* to incite the defendant to use *deadly force*. For provocation to be reasonably

sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane*, *supra*, at 635 (emphasis sic and added). It must be serious, and it must be occasioned by the victim(s). *Id.* at 637-638.

{¶74} If there is insufficient evidence of provocation to satisfy the objective component, the trial court must refuse, as a matter of law, to give an instruction on Voluntary Manslaughter. *Perry*, *supra*, at *5, citing *Shane*, *supra*, at 634. On the other hand, if the objective component *is* satisfied, "then the court should proceed to an evaluation of whether the defendant in a particular case was actually under the influence of sudden passion or rage." *Id.* In doing so, it must assess the evidence of the defendant's emotional and mental state under the circumstances at the time of the killing. *Id.*

{¶75} As the trial court must determine the sufficiency of the evidence as a matter of law, its decision whether to instruct the jury as requested is reviewed de novo. *State v. Harper*, 11th Dist. Trumbull No. 2017-T-0096, 2018-Ohio-2581, ¶58.

{¶76} Appellant asserts the trial court acknowledged that the facts at trial supported conviction for Voluntary Manslaughter by stating the following at Hamad's sentencing:

> Mr. Hamad, there is no question that the five gunshot victims came onto your property with the specific criminal intent to put, as they said, a beat down on you. However, the animus of that behavior was prompted by an equal and ongoing juvenile exchange of immature, immoral, unscrupulous, racist and obscene bravado. The people in that minivan as well as yourself participated in this relentless blather that would be too much for even the Jerry Springer show.
>
> When that fight clearly had ended, Mr. Hamad, you got your gun and you shot five people in a fit of rage because you were assaulted. While it is true that this event never would have happened if the 44-year old driver of that minivan had even an ounce of common sense,

20

it is equally true that your response to her poor judgment caused the death of two young people.

The Court acknowledges that you have no criminal history other than this event. It is unfortunate that after 47 years of dedicating yourself to your family and working hard to maintain your own business, you allowed such foolishness to reduce you to such a state.

{¶77} While the trial court did use the phrase "fit of rage," and even assuming Hamad acted in a "fit of rage," the initial determination to be made is whether it was brought on by serious provocation by the victims that was reasonably sufficient to incite Hamad into using deadly force. When viewing the evidence in a light most favorable to Hamad, we conclude this threshold objective component was not satisfied. This was also acknowledged by the trial court in the remainder of its address to Hamad:

Mr. Hamad, you had choices that day. You could have blocked their text messages and/or Facebook posts. You could have stayed in your house after the fight. You could have called the police. You could have stayed in your house after the second time instead of reloading and returning to the fray outside your doorstep and firing again. You dismissed each and every one of those viable options. Your severe overreaction to the melee from which you escaped is what brought you to this point in your life and in this courtroom today.

It is also noteworthy that Hamad's own taunting, telling Bryce and Shively to come over and fight and bring whomever they wanted, preceded this entire incident. Their arrival with the intention to do just what Hamad had challenged them to do should not have come as any surprise.

{¶78} Appellant asserts the "serious provocation" that incited Hamad was a combination of "weeks of threatening and racist comments"; "weeks of in-person harassment"; and, finally, being "quickly taken to the ground and beaten, kicked, and stomped by the victims" just before he heard someone yell, "get the gun."

21

**{¶79}** First, we note that "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *Shane*, *supra*, at paragraph two of the syllabus. Even more relevant, Hamad's use of deadly force occurred after the "mutual combat" situation had ceased, the victims had retreated to the van, and Hamad had retreated into his home. Although the victims were still on Hamad's property when he exited the house with the firearm, they were in the van at the end of the driveway, and the driver was, by all accounts, attempting to back out onto the busy state route. These were the immediate circumstances surrounding Hamad's initial decision to use deadly force.

**{¶80}** The jury could have reasonably found that the victims' provocation caused Hamad to act in a sudden fit of rage. The jury could not, however, have reasonably found the provocation so serious that it was reasonably sufficient to have incited Hamad to use deadly force. *See*, *e.g.*, *State v. Rice*, 12th Dist. Butler No. CA2003-01-015, 2004-Ohio-697, ¶37 (where the victim allegedly hit the defendant and pulled out a knife as they were arguing, the provocation was not sufficient to incite deadly force); *State v. Crago*, 93 Ohio App.3d 621, 644 (10th Dist.1994) (where the defendant shot the victim, then stood over the injured victim and fired a second shot). Moreover, Hamad's subsequent actions of retreating into his home a second time to reload before again shooting the wounded victims is evidence that Hamad had sufficient time to "cool down" after the provocation. *See*, *e.g.*, *State v. Hunter*, 9th Dist. Summit No. 28484, 2018-Ohio-568, ¶10 (where the defendant shot his already wounded victim after taking the time to "un-jam the weapon and reload it * * * even if it was only for a few seconds," he was no longer acting under a sudden passion or sudden fit of rage).

**{¶81}** The trial court did not commit error when it failed to instruct the jury on the inferior-degree offense of Voluntary Manslaughter.

**{¶82}** Appellant's first assignment of error is not well taken.

## Expert Testimony

**{¶83}** In the second assignment of error, appellant asserts the trial court committed prejudicial error when it precluded Hamad's psychological expert, Dr. James Reardon, from presenting testimony regarding Hamad's diagnosis of Post-Traumatic Stress Disorder ("PTSD").

**{¶84}** The state filed a motion in limine, seeking to prohibit Hamad from introducing the expert testimony in support of his self-defense claim. The state asserted that Ohio courts do not permit expert testimony to bolster a claim of self-defense except when the defendant is a battered woman or battered child.

**{¶85}** Defense counsel responded in support of the use of its expert in establishing Hamad's claim of self-defense. It was their position "that while an expert may not provide an opinion about the propriety of the use of self-defense, he may establish the mindset of a defendant which explains why the defendant perceived the danger as he did. Whether this perception is subjectively reasonable, is for the jury to determine." Defense counsel proffered that Dr. Reardon "would testify, in sum, that because of the constant threats of death from some of the attackers over a period of approximately six months, and the beating Hamad suffered from those who unlawfully entered onto his property on February 25, [2017,] he was suffering from Post-Traumatic Stress Syndrome. Hamad's action[s] were consistent with a person who was suffering from those symptoms." The defense argued that to preclude such testimony would violate Hamad's constitutional rights to present a defense and to equal protection under the law.

**{¶86}** The trial court found the issue was raised prematurely and reserved ruling until an appropriate time during the trial. The court additionally stated that "there is a very thin line separating the battered women's syndrome, wherein expert testimony is admissible, and post-traumatic stress disorder (PTSD), where the field of precedent is minimal. The Court further finds that even if it were to allow the expert testimony, it would be limited to establish a diagnosis only. The expert would not be permitted to offer an opinion as to the self-defense claim."

**{¶87}** At the conclusion of the state's case-in-chief, defense counsel filed a supplement to their motion to present the expert testimony of Dr. Reardon. The trial court ruled that Hamad was not permitted to introduce the testimony during the initial phase of the trial, as it is not permissible under current Ohio law. The court held:

> Although * * * Ohio has in certain instances permitted expert testimony to aid the trier of fact in a self-defense analysis, the Court finds those instances are both rare and inapplicable to the facts here. The analysis of a self-defense claim does require a certain element of subjective considerations. However, the testimony of a mental health expert is typically not required in order to conduct said analysis. The Court finds the evidence presented thus far is distinguishable and distinct from the facts in *State v. Koss* (1990), 49 Ohio St.3d 213, the origin for the use of mental health expert in a self-defense analysis.

**{¶88}** Appellant argues the trial court's prohibition of Dr. Reardon's testimony was an abuse of discretion and a violation of Hamad's constitutional right to present a complete defense.

**{¶89}** "The Ohio Rules of Evidence establish adequate preconditions for admissibility of expert testimony * * *. It is within the sound discretion of the state's judiciary, on a case by case basis, to decide whether such testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue." *State*

24

*v. Williams*, 4 Ohio St.3d 53 (1983), syllabus. Accordingly, we review a trial court's decision regarding whether to admit expert testimony for an abuse of discretion. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶155, citing Evid.R. 104(A). Moreover, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984).

{¶90} Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence that would support a defendant's explanation of the events at issue and would provide evidence as to his possible state of mind at the time of the incident is clearly relevant to his or her defense." *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998).

{¶91} Relevant expert testimony, to be admissible, must also meet the criteria of Evid.R. 702. *Id.* An expert may testify if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;

25

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶92} The disagreement between the parties on appeal centers on whether the expert testimony would have aided the jury in evaluating Hamad's state of mind at the time of the shooting.

{¶93} Appellant asserts testimony regarding Hamad's PTSD diagnosis was relevant not only to his claim of self-defense, but also to whether he acted with prior calculation and design and whether he acted in a sudden fit of rage after being provoked, because each determination rests in whole or in part on Hamad's state of mind.

{¶94} Appellant further asserts the proffered expert report meets the requirements of Evid.R. 702, to wit: (a) the specific characteristics and symptoms experienced by a person with PTSD are facts beyond the knowledge of laypersons; (b) Dr. Reardon's curriculum vitae reflects his specialized knowledge, skill, experience, training, and education in psychology and PTSD; and (c) Dr. Reardon applied his expertise using extensive, recognized scientific testing specifically conducted upon Hamad to diagnose him with PTSD with dissociative symptoms, according to the DSM-5.

{¶95} The state responds that expert testimony is not ordinarily admitted to establish a self-defense claim, because whether a defendant had a reasonable belief that he was in imminent danger of death or great bodily harm is not beyond the comprehension of the average juror. Thus, expert testimony would invade the province of the jury, with notable exceptions in cases that involve the insanity defense or battered woman syndrome.

{¶96} The expert report proffered by defense counsel indicates that Dr. Reardon performed a battery of psychological tests on Hamad, which resulted in a DSM-5

26

diagnosis of "post-traumatic stress disorder with dissociative symptoms." According to Dr. Reardon's report, "dissociation is defined as a largely unconscious, defensive alteration in awareness, that develops as an avoidance to overwhelming – often post-traumatic – psychological distress." Notably, however, Dr. Reardon determined that the onset of PTSD occurred *during* the events of February 25, not prior to:

> While [Hamad] certainly appeared to be experiencing significant anxiety, hypervigilance, sleep disruption, and other psychological symptoms prior to the assault, beating, and shooting incident of 02/25/17, the examination and testing evidence appears to confirm strongly that *the vast majority of his current psychological symptoms are experienced in the context of his assault and being beaten on 02/25/17 and the subsequent shooting incident.* There is strong evidence that he experienced a dissociative episode within the context of a post-traumatic reaction to that situation on 02/25/17. [Emphasis added.]

Dr. Reardon concluded his report with the following summary and opinion:

> It is my opinion that Mr. Hamad was experiencing significant symptoms of anxiety, worry, sleep deprivation, and stress prior to the events of 02/25/17. It is my opinion to reasonable psychological certainty that he is experiencing a Post-Traumatic Stress Disorder condition with significant dissociative symptoms, including depersonalization and derealization in response to the stressor of the assault, beating, and shooting on 02/25/17. The assault, beating, and shooting entailed a significant exposure to actual or threatened death and serious injury and was directly experienced by Mr. Hamad on 02/25/17. In addition to this severe trauma exposure, he experiences characteristic intrusion symptoms, avoidance symptoms, alterations in cognitions and mood associated with the traumatic events, and alterations in arousal and reactivity associated with traumatic events. *He has experienced this disturbance since the date of 02/25/17.* This disturbance causes clinically significant stress for him, and it is not attributable to the effects of a substance or any other medical condition. [Emphasis added.]

{¶97} We find this situation vastly distinguishable from those cases cited by appellant wherein expert testimony was found admissible to assist the jury with a defendant's self-defense claim. In *State v. Koss*, 49 Ohio St.3d 213 (1990), the Supreme

27

Court of Ohio held that, "[w]here the evidence establishes that a woman is a battered woman, and when an expert is qualified to testify about the battered woman syndrome, expert testimony concerning the syndrome may be admitted to assist the trier of fact in determining whether the defendant acted in self-defense." *Id.* at 218. "'A *history* of physical abuse alone does not justify the killing of the abuser. Having been physically assaulted by the abuser in the past is pertinent to such cases only as it contributes to the defendant's state of mind at the time the killing occurred; e.g., in that it formed the basis for the woman's perception of being in imminent danger of severe bodily harm or death at the hands of her partner.'" *Id.* at 217, quoting Browne, *When Battered Women Kill* (1987) 175 (emphasis sic). Similarly, expert testimony on battered child syndrome was deemed admissible in the prosecution of a defendant for the murder of his mother. *State v. Nemeth*, 82 Ohio St.3d 202 (1998).

**{¶98}** Here, there is no history of physical abuse between the victims and Hamad that would have formed the basis for Hamad's perception of being in imminent danger of death or severe bodily harm at the hands of the victims. Until the assault and shooting took place on February 25, only verbal threats and harassing behavior had been exchanged between them.

**{¶99}** In *State v. Warner*, 11th Dist. Portage No. 2006-P-0048, 2007-Ohio-3016, this court held that expert testimony of PTSD is relevant when a defendant seeks a Voluntary Manslaughter instruction because it may assist the jury in determining the defendant's subjective state of mind. *Id.* at ¶44. The facts in *Warner* are not comparable to Hamad's defense. First, the defendant in *Warner* was a Vietnam War veteran who had suffered from PTSD for at least twenty years prior to the homicide. Second, even if Dr. Reardon's testimony would have assisted the jury in determining whether the victims'

28

conduct caused Hamad to act in a sudden fit of rage, he still would not have been entitled to a Voluntary Manslaughter instruction. As we held under the first assignment of error, the jury could not have reasonably found that the victims' provocation was reasonably sufficient to have incited Hamad to use deadly force.

{¶100} We conclude the trial court's exclusion of Dr. Reardon's expert testimony was neither an abuse of discretion nor a violation of Hamad's constitutional right to present a complete defense.

{¶101} Appellant's second assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶102} In the third assignment of error, appellant maintains Hamad's convictions violated his right to due process, as they were against the manifest weight of the evidence.

{¶103} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997) (emphasis sic), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

> 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'

*Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with

29

the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

{¶104} To convict Hamad of Aggravated Murder and Attempted Aggravated Murder, the jury had to find, beyond a reasonable doubt, that he "purposely, and with prior calculation and design," caused the deaths of Haber and Williams and attempted to cause the deaths of the other three victims. R.C. 2903.01(A) and R.C. 2923.02(A).

{¶105} Appellant first asserts the jury lost its way because the greater weight of the evidence demonstrates that Hamad did not act with "prior calculation and design." He asserts, rather, that the evidence demonstrates Hamad acted with "an uncalculated reaction to the events as they unfolded before him."

{¶106} A finding by the trier of fact of "prior calculation and design" is justified when the "evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus. "'Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves,' but 'momentary deliberation' is insufficient." *State v. Taylor*, 78 Ohio St.3d 15, 22 (1997), quoting Committee Comment to Am.Sub.H.B. No. 511, R.C. 2903.01; *Cotton*, *supra*, at paragraph two of the syllabus ("instantaneous deliberation is not sufficient").

{¶107} In line with the case law, the jury received the following instruction:

> Prior calculation and design means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means and instrument with which to cause the death. To constitute

prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

{¶108} "While the Ohio Supreme Court has declined to uphold findings of prior calculation and design in 'explosive, short-duration situations,' the court nonetheless has upheld some 'short-lived emotional situations' that do not fit the classic mold of a 'planned, cold-blooded killing.'" *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, ¶18 (10th Dist.), citing *Taylor*, *supra*, at 19-20. The determination in each case necessarily depends on the facts and evidence presented at trial. *Id.*, citing *Taylor*, *supra*, at 20.

{¶109} Three factors are traditionally considered on judicial review in determining whether a defendant acted with "prior calculation and design": "'(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, ¶20, quoting *Taylor*, *supra*, at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976); *see also State v. Whisenant*, 127 Ohio App.3d 75, 92-93 (11th Dist.1998). More specifically, strong indications of "prior calculation and design" have been found when a defendant pursued and killed "a fleeing or incapacitated victim after an initial confrontation" and when a defendant carried out a prior threat to obtain a weapon and kill the victim. *Id.* at ¶21-22 (collecting cases).

{¶110} The evidence presented to the jury demonstrated multiple facts in support of a finding that Hamad acted with "prior calculation and design." First, there was a severely strained relationship between Hamad and the victims.

{¶111} Second, the decision to shoot the victims was not made after a "momentary" deliberation. Hamad walked from the van, across his yard, into the house, obtained the firearm from the bedroom, walked outside, began shooting, walked across his yard, and shot directly into the van. Then he did it all a second time. This was not an "instantaneous eruption of events"; there was sufficient time and opportunity for Hamad to plan the acts of homicide.

{¶112} Third, the circumstances demonstrate Hamad was determined to implement a decision to kill. Hamad began shooting almost immediately upon leaving the house and then walked closer to shoot the victims at close range. Hamad reloaded and shot the victims several times after they were already wounded, and even as they were attempting to flee. Further, there was testimony that, after he was handcuffed, Hamad yelled to Bryce something to the effect of, "This is what you deserve. I'm not done with you, you little bitch"; or "That's what you get, you little bitch. How do you like that?" In his police interview, Hamad also stated that—after he heard one person say, "grab the gun," saw that another had a knife out, and noted the driver would not stop moving—"I was already close to the van. I just started firing. I got tired of this shit. They been fucking with me for a long time."

{¶113} Although the entire altercation lasted mere minutes, the evidence of Hamad's actions during that time weighs strongly in favor of a determination that he was carrying out a calculated decision to kill his victims. Perhaps this decision was not conceived prior to the victims arriving on Hamad's property, but it was also not

32

"instantaneous." Appellant's argument that a finding of "prior calculation and design" is against the manifest weight of the evidence is not well taken.

{¶114} Appellant next asserts the jury lost its way because the greater weight of the evidence demonstrates that Hamad's use of deadly force was in self-defense. He maintains the facts adduced at trial demonstrate Hamad was not at fault in creating the confrontation, he had a bona fide belief that he was in imminent danger, and his only means of escape was to utilize deadly force.

{¶115} At the time of Hamad's trial, R.C. 2901.05(A) provided, in relevant part, that "the burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused."

{¶116} "In Ohio, the affirmative defense of self-defense has three elements: (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997), citing *State v. Williford*, 49 Ohio St.3d 247, 249 (1990) and *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. The second element is a combined subjective and objective test: "self-defense 'is placed on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" *Id.* at 330, quoting *State v. Sheets*, 115 Ohio St. 308, 310 (1926).

{¶117} Over the state's objection, the trial court instructed the jury on self-defense, stating "the Defendant must prove by the greater weight of the evidence that:

33

A. He was not at fault in creating the situation giving rise to the circumstances;

B. He had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of death or great bodily harm, and that his only reasonable means of retreat from such danger was by the use of deadly force; and

C. He had not violated any duty to retreat to avoid the danger.

{¶118} Based on all of the evidence presented at trial, as outlined throughout this opinion, nothing suggests the jury lost its way by rejecting Hamad's claim of self-defense. Regardless of Hamad's subjective belief as to the danger he faced, the circumstances surrounding the homicides do not demonstrate that his only reasonable means of retreat from that danger was by the use of deadly force.

{¶119} Hamad's convictions were not against the manifest weight of the evidence.

{¶120} Appellant's third assignment of error is without merit.

**Prosecutorial Misconduct**

{¶121} In the fourth assignment of error, appellant asserts the trial court's limited curative instruction and denial of a mistrial following an instance of prosecutorial misconduct resulted in an unfair trial that violated Hamad's constitutional rights.

{¶122} The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial "by an impartial jury." This right is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466 (1965). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

34

{¶123} "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209 (1982), syllabus. Accordingly, prosecutorial misconduct alone does not require a new trial. *See id.* at 220. "The conduct of a prosecuting attorney during trial cannot be made a ground of error *unless* the conduct deprives defendant of a fair trial." *State v. Apanovitch*, 33 Ohio St.3d 19, 24 (1987) (emphasis added), citing *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984); *see also State v. Fears*, 86 Ohio St.3d 329, 332 (1999). "[I]t must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty." *Maurer*, *supra*, at 267, citing *State v. Smith*, 14 Ohio St.3d 13, 15 (1984).

{¶124} Appellant argues a comment made by the prosecutor during Tracy's cross-examination deprived Hamad of a fair trial. Tracy was called as a court's witness. The following exchange occurred between Tracy and the prosecutor:

> Q: But once you and the defendant went back in the house after the fistfight is over, after the beating him and kicking him and pushing him down, you never looked out to see where that van went?
>
> A: I went behind the fireplace.
>
> Q: But you never told anybody that until – when you came and saw me, you never said that in your written statement, right?
>
> A: No.
>
> Q: You never said that in your recorded statement that we reviewed?
>
> A: No, I did not.
>
> Q: It's only after – the defense has talked to you numerous times; correct?
>
> A: Well, yes, I've talked to them.
>
> Q: You've talked to me once?

A: Yes.

Q: And now we have an idea of what our defense would be, that you should hide behind that fireplace?

A: He always told me to hide behind –

[Defense Counsel 1]: Objection.

[Defense Counsel 2]: Objection, Your Honor.

The Court: Hold on. Basis of your objection?

[Defense Counsel 1]: The implication that the defense has done anything improper, suggesting what her testimony would be.

[Defense Counsel 2]: We have a motion for the Court, too.

[Prosecutor]: I will withdraw that question.

[Defense Counsel 2]: We still have a motion for the Court.

The Court: The jury is to disregard the question.

[Defense Counsel 2]: Your Honor, may I?

The Court: Side bar.

(Whereupon, the following side-bar discussion was held on the record.)

The Court: Your motion.

[Defense Counsel 2]: Your Honor, that was a direct allegation, without any question whatsoever, not veiled in any way that the defense got together with her – I'm sorry – that the defense somehow got together and manufactured testimony with her. That is absolutely false. And I think this prosecutor, while willing to switch the questioning, he knows that that was an improper question. We move for a mistrial.

The Court: Would you like to respond?

[Prosecutor]: Yeah. I will withdraw the question. I probably misstated what I wanted to say. And I apologize for that,

36

because I do know these gentlemen and I'm not trying to imply that. In fact, I'll even say I am not implying that. If you want me to, I will stress that, that that's not what I'm implying.

The Court: Well, hold on.

[Prosecutor]: I don't think it's grounds for a mistrial.

The Court: It was totally improper. I'm going to give an instruction right now to the jury to disregard what your – your questioning and any reference to the defense of any question to the defense. Do not go there in any way, shape or form. And you need to tone it back because you're being way too aggressive. Okay. Motion for a new trial is denied.

(End side bar.)

The Court: Ladies and Gentlemen of the Jury, the question by the prosecutor as to any correspondence or any discussion between this witness and the defense is to be disregarded as it was never asked [sic]. This witness is well within her rights to speak to either side at any time. There is not any reference or any – anything to be drawn from that in any way, shape or form. You may continue, counsel.

[Prosecutor]: Thank you, Your Honor. And, again, I apologize to defense counsel and this witness. I did not mean that question to come out the way it did.

{¶125} We do not condone the prosecutor's decision to ask the question. The question insinuated that defense counsel had suborned perjury, that the witness had manufactured her testimony based on her sympathies for the defendant, or both. No evidence existed to substantiate either scenario. It was clearly improper. *See*, *e.g.*, *Smith*, *supra*, at 14 (citation omitted) ("the prosecution must avoid insinuations and assertions which are calculated to mislead the jury").

{¶126} We conclude, however, that the trial court properly instructed the jury not to draw *any* reference from the question and to disregard the prosecutor's question as though it had not been asked. Nothing in the record rebuts the presumption that the jury followed the curative instruction. *See State v. Raglan*, 83 Ohio St.3d 253, 264 (1998),

37

citing *State v. Goff*, 82 Ohio St.3d 123, 135 (1998). Further, the prosecutor was admonished by the court in the jury's presence, and the prosecutor apologized to Tracy and defense counsel in the jury's presence. The prosecutor then completely abandoned that line of questioning. Tracy's testimony was highly relevant: she was Hamad's girlfriend and Bryce's mother, and she had firsthand knowledge of the events that led up to the physical altercation and the shooting. She was not, however, the only eyewitness to the events of February 25, 2017.

{¶127} We conclude the prosecutor's question of Tracy on cross-examination did not deprive Hamad of his constitutional right to a fair trial by an impartial jury. The prosecutor apologized and explained it was a misstatement, the trial court gave an appropriate curative instruction, and the jury's verdict was not against the manifest weight of the evidence. It is clear to us beyond a reasonable doubt that, absent the question, the jury would have returned the same verdict. *See, e.g.*, *State v. Martin*, 21 Ohio St.3d 91, 96 (1986); *State v. Benge*, 75 Ohio St.3d 136 (1996).

{¶128} Thus, the trial court did not abuse its discretion in failing to grant a mistrial on that basis. *See State v. Sage*, 31 Ohio St.3d 173, 182 (1987) (granting or denying a mistrial under Crim.R. 33 rests within the sound discretion of the trial court).

{¶129} Appellant's fourth assignment of error is without merit.

{¶130} The judgment of the Trumbull County Court of Common Pleas is hereby affirmed.


THOMAS R. WRIGHT, P.J.,

MARY JANE TRAPP, J.,

concur.